EDGERTON and Others *v.* HUFF.

EMINENT DOMAIN.—HIGHWAYS.—The power to appropriate property in any manner, without the consent of the owner, is in derogation of private right, and such appropriation should not interfere, further than public necessity requires, with the right of the owner to enjoy his property. Page 39.

SAME.—Where a simple servitude is sufficient to answer the public want, the courts should, when it is possible by reasonable construction, so limit the legislative enactment. Page 39.

SAME.—INTERNAL IMPROVEMENT LAW.—CONSTRUCTION OF.—The legislature, by section 19 of the internal improvement law of 1836, declared that a release of a right of way was all that was required by the State for the purpose of constructing the public works contemplated by that act, and in the face of this declaration it was not in the power of the State to condemn a greater interest than a mere easement. Page 41.

SAME.—Section 6 of the act of *February* 19, 1838, "for the protection of the canals belonging to the State," &c., and the act of *January* 19, 1846, for the sale of the *Wabash and Erie Canal*, &c., were not intended to be declaratory of the interest held by the State as against the owners of the soil. Page 42.

CANALS.—RIGHTS OF THE OWNERS OF THE SOIL.—The canals constructed under the internal improvement law of 1836 were built for navigation, and to furnish hydraulic power, and the proprietor of the soil is entitled to every use to which the land can be applied consistently with an easement for the purposes named. Page 46.

SAME.—RIGHT TO TAKE ICE.—The owner of the fee is entitled to take ice from the canal, if the taking of it does not interfere with navigation, or with the use of the water for hydraulic purposes. Page 46.

APPEAL from the *Tippecanoe* Circuit Court.

RAY, J.—This is a suit brought by the appellants, who are lessees of the trustees of the *Wabash and Erie Canal*, against the appellee, claiming the right to control and use the ice formed in that part of said canal known as the "*Wide-water*," to the exclusion of the owner of the lands through which the canal passes. It was admitted that the taking of the ice by the owner of the fee did not in anywise interfere with the "navigation of the canal, or with the use of the water for hydraulic purposes, and that no injury resulted to the tow-path of the canal, or to the use of said tow-path, by reason of the acts of the defendant."

The question presented is, Has the owner of the land through which the canal passes the right to use the surplus water in the canal, doing no injury to the canal, and not interfering with the use of the water for navigation or hydraulic purposes, or have the appellants the right to use such surplus water as an article of merchandise?

The State, for the purpose of constructing the *Wabash and Erie Canal,* by virtue of the right of eminent domain, appropriated the lands and materials required to carry forward that public work. We will be aided in determining the proper construction to be given to the action of the legislature in authorizing such appropriation, by first fixing the limit of legislative power.

The law is universally recognized, as stated by *Bynkershoek,* that this right of eminent domain may be lawfully exercised whenever public necessity or public utility requires it, and the sovereign power may take from proprietors those things without which highroads can not be made; and this right may be imparted to others, occasionally, as to the chief magistrates of towns, cities, &c.; but if houses and lands be taken from individuals, adequate compensation should be made.

It was held in the case of *Varick* v. *Smith,* 5 Paige Ch. R. 137, (and on appeal in 9 Paige 537,) "that the government has the power, under the constitution, to appropriate the private property of its citizens just so far, and no further, than is necessary for the purpose and object of the appropriation; and that may be an absolute and exclusive right to land or water, or it may be a partial, or common, or usufructuary right, according to the nature of the property, or the circumstances of the case. But when such purpose is accomplished, the right of the state is exhausted, and the whole of the residue of the property, whatever it may be, belongs to the citizen."

In Angell on Highways, section 83, it is said: "It is very obvious, that in taking private property, under the express authority of government, for public use, no more should be taken than is demandable by the exigencies of the community, and the least possible private injury in so doing should be committed." Numerous authorities are cited in support of this position. It was stated by Lord ELDON that the true principle applicable to all such cases, is that the private interest of the individual is never to be sacrificed to

a greater extent than is necessary to secure a public object of adequate importance.  1 Mylne & Keene Ch. R. 162.

In the case of *The Trustees, &c.,* v. *The Auburn and Rochester Railroad Company,* 3 Hill 567, it was held that "the laying out of a highway gives to the public a mere right of passage, with the powers and privileges incident to such right, and the owner of the soil over which the road passes is not thereby divested of his title to the land."

Chief Justice PARSONS, in delivering the opinion in *Perley* v. *Chandler,* states the rule thus: "By the location of a way over the lands of any person, the public have acquired an easement which the owner of the land cannot lawfully extinguish or unreasonably interrupt.  But the soil and the freehold remain in the owner, although incumbered with a way.  And every use to which the land may be applied, and all the profits which may be derived from it, consistently with the continuance of the easement, the owner can lawfully claim."  6 Mass. 453.  The author already cited declares that "turnpike roads, railroads and canals, like ordinary highways, are as a general rule simple easements, the fee remaining in the owner of the soil, and upon their abandonment reverting without further incumbrance.  During the existence of such road or canal the rights of the owner of the fee are subject to the same rule as in the case of ordinary highways."

*The People* v. *White,* 11 Barb., S. C. R. 26, construes an act of the legislature which authorizes the canal commissioners to take possession of any lands, waters and streams "necessary for the prosecution of the improvement intended by" that act, and points out the mode in which the damage shall be ascertained and paid, and then declares "the fee simple of such premises so appropriated shall be vested in the people."  This language is used in the opinion: "The State has no right to take what is not necessary for the improvement.  I see no reason why this restriction does not apply as well to the duration of the estate as to the extent of the actual occupation."  In that case, so far as

the language of the statute admitted of a construction in derogation of the title of the sovereign power, that construction was adopted by the court. It was held that as only the damages sustained by the owner of the land, over and above the benefit he received, were to be allowed, the title remained in the people of the State only so long as the canal was kept up, and the proprietor continued to receive the benefit of its existence. The Court of Appeals of *New York* held in the case of *Heyward* v. *The Mayor, &c.,* 3 Seld. 314, that the State had the power, through the legislature, to take in fee simple absolute private property for public uses, and that the existing necessity for taking by such title must be determined by the legislature. This, however, does not deny the doctrine that unless the intention is clearly expressed otherwise, the courts will treat the right of the State in the land as a mere easement, in all cases where such use will supply the public necessity. The power to appropriate property, in any manner, without the consent of the owner, is in derogation of private right, and such appropriation should not interfere, beyond what the public requirements demand, with the right of the owner to enjoy his property. Where, therefore, a simple servitude is sufficient to answer the public want, the courts should, in our opinion, where it is possible by reasonable construction, so limit the legislative action.

By the "act to provide for a general system of internal improvements," approved *January* 27, 1836, an extension was ordered of the *Wabash and Erie Canal* from the mouth of *Tippecanoe* river, down the valley of the *Wabash,* to *Terre Haute,* and thence to connect with the *Central Canal.* The board of internal improvements were, by the 16th section, empowered "to enter upon, and take possession of and use, all and singular, any lands, streams and materials of any and every description necessary for the prosecution and completion of the improvements contemplated by this act; and to make all such canals, feeders, dams, locks, railroads, turnpike roads and other works as they may think neces-

sary for making said improvements, avoiding in all cases
unnecessary damage or injury to the proprietors." The right
"to enter upon and take possession and use," is given as com-
pletely in regard to the lands necessary for the prosecution
of the work, as it is as to those lands which were to be
permanently appropriated for the bed of the canal. It is
evident where lands were to be used simply for the prose-
cution of the work, either for temporary turnpikes or rail-
roads, that the statute did not provide that the entry upon
the same should transfer any title to the State beyond a
right to use them for the purpose required.

The 17th section of the act provides that "in all cases
where persons may feel aggrieved or injured by the con-
struction of any of the works contemplated by this act, or
by the use of materials for the same, the person or persons
so feeling aggrieved or injured shall make out a written
statement of the cause of such complaint, particularly des-
cribing the nature of the injury, and the interest or interests
of the complainants therein." This statement the act di-
rects shall be delivered to the board of internal improve-
ments, and three appraisers are to be appointed by them,
"who shall take into consideration the benefits resulting
to such complainant from the construction of the works
which occasioned the supposed injury, and the damages so
assessed by said appraisers, when no appeal is taken, or the
amount settled by the judgment of a judicial tribunal, shall
be paid to the party injured by the board of internal im-
provement. Provided, that no claim shall be recovered or
paid by said board unless the application therefor be made
as herein provided, within two years next after the property
shall have been taken possession of as aforesaid."

The 18th section provides that the board shall, by one or
more of its members, proceed in due time along the line of
the canal, and take from the persons through whose land
the canal may pass, releases to the State of the necessary
land, timber, stone and other materials required to construct
said works, "which releases shall operate so as to vest in

said State a full and complete right to enter upon, use and take the same at any and all times thereafter."

By the 19th section, "said board, or any member as aforesaid, in taking releases as aforesaid, is hereby authorized in consideration of any privilege granted by individuals to the State of the right of way, or other privilege, to contract with such individual, on behalf of the State, to erect across said canal any bridge or bridges for the benefit of such individual and the public."

It is thus declared by the legislature that a release or grant "of the right of way" is all that is required by the State to carry forward these works of public improvement, and in the face of this legislative declaration of the easement required in the land for the benefit of the public, it would not, upon the refusal of an owner to grant this right of way, be in the power of the State, by virtue of her right of eminent domain, to condemn any greater estate in the land. The legislature has the power to declare what estate is required in the land, and whatever the extent of that may be, even to a fee simple absolute, may be condemned; but having declared a less estate sufficient, nothing more can be appropriated.

In our opinion, the legislature, having declared the interest which it was considered necessary to acquire in the land over which the canal passed to be a mere servitude, has not sought to appropriate any greater title. The use of the property for the purposes of the canal is all that this statute authorizes. The compensation is provided for persons who are "injured by the construction of any of the works contemplated by this act, or by the use of materials for the same," and not for the injury caused by the taking of the absolute title to the property. Perhaps by placing some of the provisions of the act under consideration in contrast with those of the act of 1832, providing means for the construction of the *Wabash and Erie Canal*, the legislative intent will become more clearly apparent. The latter act authorized the canal commissioners "to receive, on behalf the State,

from the owners of any such land, such grants and convey-
ances as may be proper and competent to vest a good title
thereto in the State." And in close accordance with this
legislative declaration of the title deemed necessary to be
acquired, it was also provided, that of the lands taken by
the State under the right of eminent domain, "the fee
simple of the premises shall be vested in the State." So
also, in all cases, notice by publication was to be given to the
owners of such property as was required by the State, who
declined to convey a good title thereto to the State, of the
time when and place where the jury of twelve inhabitants of
the county, duly summoned by a justice of the peace, would
determine the compensation to which they were entitled.
In the act of 1836, *supra,* no notice is provided for to the
owner of the property, the use of which is about being
taken by the State, and the authority given to the board
of commissioners to accept simple releases of the right of
way, corresponds with the authority given to the board "to
enter upon, take possession of and use" the land and ma-
terials required for the purposes of the canal.

We cannot regard the 6th section of the act of *February*
19, 1838, "For the protection of the canals belonging to
the State, the collection of tolls thereon, and for other pur-
poses," as intended to be declaratory of the interest held
by the State as against the owners of the soil. Nor can
the act of *January* 19, 1846, directing the governor of the
State to execute and deliver to the trustees of the *Wabash
and Erie Canal* a deed or patent for the bed of the *Wabash
and Erie Canal* and its extensions, and all the property, right,
title and interest of the State in and to the same, subject,
nevertheless, to all existing rights and equities against the
State on account of the same or any part thereof, be re-
garded as expressive of a legislative opinion as to the title
held by the State. Whatever interest the State had in
the bed of the canal, &c., was intended to be and was con-
veyed. What that interest was, the legislative branch of
the government was not called upon to decide.

In the case of *Hollis* v. *Goldfinch et al.*, 1 Barn. & Cress. 205, certain persons were authorized by an act of Parliament, "to make navigable for boats and vessels the river *Itching*, and certain other rivers therein named, and to cut, dig and make such and so many new channels to, from, by or into any or either of them, or to scour, cleanse, deepen or widen all the said rivers, channels, brooks or water courses, and to do all or any other acts, as might be fit for navigation, or passing by water to or from all or any of the aforesaid rivers or places where it may be made passable." There then followed a clause authorizing them "to build or make upon the banks adjoining said rivers, in convenient places, locks, weirs, sluices, turnpikes, pens or dams for water, and ways, passages and bridges, and to make cranes for wharves, to alter ways and bridges and to make towing paths. And in order that the making all or any of the premises should not be in anywise prejudicial to any persons that have any lands, &c., weirs, mills, or other property whatever, made use of for the making of the aforesaid premises to the aforesaid rivers, new channels, &c., it was provided that the undertakers should not dig, cut, carry or make any trench, river or water course, or use the locks, weirs, pens for water, cranes and wharves, or the passages, ways, bridges or foot-rails, in or upon the land of any person, until a full agreement with and satisfaction to the respective owners or occupiers of the lands be had or made by any five of the commissioners appointed by the act, or by the persons authorized to make the navigation, or until such recompense or satisfaction shall be given according to the determination of the commissioners or agreement."

By a subsequent clause the justices of the peace were made commissioners and were authorized to hear evidence, and where a new cut was to be made, "the commissioners were to determine what satisfaction any person should have for or in respect of any prejudice, loss, or damage sustained for such proportion of his lands, &c., in or next adjoining to said navigation, river, &c., as should be made use of

for bridges, ways or passages, or by doing anything appointed or consented to be done by said act, in case the undertakers should not have agreed beforehand and satisfied the parties so damnified." It was argued that "as the act itself expressly provides that no. land should be used for purposes of the navigation until an agreement with and satisfaction to the land owners had been made by the undertakers of the canal, and as acts of ownership were proved to have been exercised by the latter for a long period of time, it might fairly be inferred that the land could not have been so used unless an agreement had been made vesting the soil in the proprietors." ABBOTT, C. J., in deciding the case, said: "I think, however, the point with respect to the origin of the ownership, if any such ever existed, was not so distinctly presented to the jury as it ought to have been. That origin must have been under, although not by virtue of, the act of parliament. Now it is observable that there is not one word in the act denoting purchase or sale, or that the soil is to become vested in the undertakers of the canal. It has been said that acts of this kind in the reign of Car. 2 were drawn up more concisely than they have been in later times. That probably is true, but it certainly was as easy then, if the legislature had contemplated a purchase, to have given to the commissioners the power of assessing the price to be paid for the land taken on purchase, as to have put the words into the act, that they should have the power to say how much and what satisfaction persons should have in respect of any prejudice, loss or damage. Now if all the act gives authority to the undertakers to do might be accomplished without the purchase of the soil, there is no reason to suppose that the soil would be purchased. It is quite obvious that the purposes of the act might be accomplished without the purchase of the soil. * * * It is not essential to a navigation that the proprietors of it should be the owners either of the soil over which the water flows, or of the adjoining land." BAYLEY, J., said: "The act of parliament

gives to the commissioners the power to do all acts which may be necessary for the purpose of making new channels; and provides that satisfaction shall be made from time to time for any injury which may arise to third persons. Now, under this power of making new channels, the commissioners would have a right not only to excavate, but to make banks in order to keep the water in the channels. They are authorized not only to use the channel, but also the adjoining land for any purpose which may be necessary, in order to effect the objects contemplated by the act of parliament, but it gives them no power to purchase that land. * * * It has been suggested that although the proprietors, when they excavated the canal, did not buy the adjoining land, yet that by laying on the bank the earth dug out of the channel, they would have a right to whatever might be growing on that bank; but it seems to me that that is not so. They would be excused from the trespass committed by laying the earth on the adjoining land, because for that they would have made satisfaction; they would be entitled to use the bank for all the purposes of navigation, but they would have no legal right to have the bank for the purpose of growing anything upon it." HOLROYD, J., said: "I am clearly of opinion that the act of the 16 and 17 Car. 2, did not give the right of soil to the proprietors of the canal, it contains no clause compelling the proprietors of land to sell. Any purchase, therefore, would be totally independent of the powers given by the act of parliament. The act does compel the proprietors to allow the use of the land through which the river passes, and of the land adjoining, for all purposes useful or beneficial to the navigation."

BEST, J., expressed this opinion, "I am of opinion that the statute of the 16 and 17 Car. 2 gives no right to the undertakers of the canal to purchase the soil; it gives a mere easement, a right to make and cut the canal and towing paths, and such other things as are necessary for the purposes contemplated by the act."

The construction thus given to the act of parliament we think clearly sustains us in the view that the State acquired a mere easement in the soil through and over which the canal was constructed.

The rights of the proprietors of the soil have been already stated. In the language of the learned judge already cited, "every use to which the land may be applied, and all the profits which may be derived from it, consistently with the continuance of the easement, the owner can lawfully claim." The purposes of the canal were navigation and to furnish hydraulic power. In the case of *Cooper* v. *Williams*, 5 Ohio 392, it was ruled that water could not be taken in the canal for the purpose of furnishing hydraulic power. In *Buckingham et al.* v. *Smith et al.*, 10 Ohio 288, it was held that the State could not take water over and above the supply required by navigation for the purpose of sale. But, without comment upon these decisions, it is sufficient that in this case the agreement states that the taking of the ice by the owner of the fee does not in anywise interfere with the "navigation of said canal, or with the use of the water thereof for hydraulic purposes, and that there was no injury resulting to the tow-path of the canal, or to the use of said tow-path, by reason of the acts of the defendant."

It is insisted, however, that the authorities holding that a railroad company is entitled to the exclusive use of the track are in conflict with the rule we have stated. The case of *The Philadelphia and Reading Railroad Company* v. *Hummell*, 44 Penn. St. R. 375, is cited as authority for this position. We regard the case, however, as an apt illustration and a correct application of the principle we have stated. Mr. Justice STRONG, in delivering the opinion of the court, uses this language: "It is time it should be understood in this State that the use of a railroad track, cutting or embankment is exclusive of the public everywhere except where a way crosses it. This has more than once been said,

and it must be so held, not only for the protection of property, but, what is far more important, for the preservation of personal security, and even of life. In some other countries it is a penal offense to go upon a railroad. With us, if not that, it is a civil wrong of an aggravated nature, for it endangers not only the trespasser but all who are passing or transporting along the line. As long ago as 1852 it was said by Judge GIBSON, with the concurrence of all the court, that 'a railway company is a purchaser, in consideration of public accommodation and convenience, of the exclusive possession of the ground paid for to the proprietors of it, and of a license to use the highest attainable rate of speed, with which neither the person nor property of another may interfere.'"

We regard this as good law, and we approve not only of the result reached, but of the legal principle upon which the conclusion is based. It may be thus stated: The railroad company, for the benefit of the public, have the license to use the highest attainable rate of speed; any use of the track by the proprietors of the soil, or by others, except at public crossings, endangers not only the trespasser but all who are passing along the road; any such use of the track is therefore inconsistent with the easement granted to the company, and is unlawful. It is unlawful because inconsistent with the continuance of the easement; if it were not inconsistent it would not be unlawful.

The case of *Hazen* v. *The Boston, &c., R. R.*, 2 Gray 574, confirms this position. It is held in that case that "the right acquired by the corporation, though technically an easement, requires for its enjoyment a use of the land permanent in its nature and practically exclusive."

The court in the case of the *Chicago and Mississippi R. R.* v. *Patchin*, 16 Ill. 198, to which we are also cited, place the decision upon the same ground. "These roads, it is said, with the mode of operating them, would become dangerous to travel and almost useless to their owners, if the

immunities of herds of wandering, loitering cattle upon them can be put upon the footing of protected privileges."

The agreed statement of facts in this case precludes the idea that any such practically exclusive possession is requisite for the full enjoyment of the easement in question.

The ruling of the Circuit Court being in full accord with the views herein expressed, the judgment is affirmed, with costs.

*R. Jones, B. W. Langdon, H. W. Chase* and *J. A. Wilstach,* for appellants.

*J. M. La Rue* and *S. A. Huff,* for appellee.