O'REILEY and Others *v.* THE KANKAKEE VALLEY DRAINING COMPANY.

32  169
154  620

DRAINING ASSOCIATION.—*Legislature.—Police Power.*—The legislature has power to authorize the organization of companies for the purpose of draining swamp lands. This authority of the legislature is referable to the police power—the right of the legislature to require the owner of property to so use his own that his neighbor may have such reasonable enjoyment in his own possessions as naturally adheres thereto.

SAME.—*Abuse of Power.*—The abuse of this power must be prevented by the courts, but its reasonable exercise cannot be denied.

SAME.— *Act of* 1869. — The act of 1869, "to authorize and encourage the construction of levees, dikes, and drains, and the reclamation of wet and overflowed lands by incorporated companies," &c., Acts 1869, p. 82, is not an abuse of such police power.

SAME.—*Articles of Association.—Description of Drain.*—It is an essential prerequisite to the organization of a draining association under said act, that the lands to be affected by the proposed work must be described in the articles of association, or there must be such a plain description of the commencement, the line, and the termination of the ditch as will enable all persons to form, with reasonable certainty, an opinion regarding their personal interest in the corporation.

APPEAL from the Newton Circuit Court.

RAY, J.—The appellant O'Reilly filed his complaint in the Newton Circuit Court. Subsequently, on motion, other parties were admitted as plaintiffs. As the complaint states fully the questions presented, and the articles under which the appellee claims to act are set out therein, we give, it in substance:—

James O'Reiley, the plaintiff in this suit, complains of the Kankakee Valley Draining Company, the defendant, and says that the plaintiff is the owner in fee simple of the following described land, situated in Newton county, to wit: the south-west quarter of the south-west quarter of section four in township thirty, north of range eight west, which lies in the valley of the Kankakee river, and near to the said river; that the same is wet or marsh land, the surface water from which naturally flows into the Kankakee river. He further says that the same is a part of the

marsh land ceded by the United States to the State of Indiana, and has been partially drained under and by means of the system of drainage instituted and carried into effect by the State of Indiana. The plaintiff further says that the defendant is a corporation, organized under the act of the general assembly, of June 12th, 1852, entitled "an act to authorize the construction of levees and drains," and several acts amendatory thereof and supplementary thereto, and has caused its articles of association to be recorded in the recorder's office of the several counties of St. Joseph, Laporte, Marshall, Starke, Porter, Lake, Jasper, and Newton, the same having been recorded in the said county of Newton on the —— day of ——, 1868; and the plaintiff files a copy of said articles of association, and makes the same a part of this complaint: "Article 1. The name of the association is and shall be the Kankakee Valley Draining Company. Article 2. The objects of the association are: 1. To reclaim or improve the lands of the valleys of the Kankakee river and its tributaries, by clearing out and deepening the present channel of said river in some places, and by excavating and opening new and more direct channels or drains therefor in other places, accordingly as the same may seem best adapted to economically and effectually drain said valley and reclaim and improve said lands; and also by cutting and opening such lateral ditches, and in such manner clearing out, deepening, and straightening the channels of such tributaries as may be necessary to convey all the waters of the tributaries thereof, and of such adjacent lakes, ponds, swamps and marshes as the association shall think it practicable and best to drain, and permit the same to flow freely into such new or improved channel to said river, so as that the lands of said valley, which are now injured or rendered valueless by the waters of said river, or any tributary thereof, or by any such lake, pond, swamp, or marsh, adjacent thereto, may be reclaimed or improved, the health of the country promoted, and the owners of the lands and the public generally benefitted; and 2. To purchase from time to time,

and to receive donations of lands which shall have been, or which may thereafter be, benefited by the performance of said work, and to hold the same as the property of the association, and from time to time sell and convey parcels of the same, as and when the association shall deem its interests promoted thereby. The proposed work is to be performed along the Kankakee valley, between the place where the river crosses the line between the states of Indiana and Illinois and a point on said river in St. Joseph county, to be hereafter determined by a survey, and will extend through into the counties of Lake, Newton, Jasper, Porter, Laporte, Starke, and St. Joseph, the distance between the terminal points being about seventy miles in a straight line. All the lands believed to be liable to be affected by the proposed work, lie within the territory embracing the counties aforesaid, and Marshall county—portions thereof being situated in each of said counties. Article 3. The residence of the members, and the number of acres of land in which they are respectively interested, appear in the margin below. The principal office of the association shall be at Laporte until otherwise ordered by the board of directors. Article 4. Any person interested in the proposed work may become a member of the association by subscribing these articles, and each person, at the time of subscribing, shall write opposite his name the place of his residence and the number of acres of lands in which he is interested, that will be affected by said work. Those who subscribe before the lapse of twenty days after the first election of directors, shall, within the said twenty days after the said first election, furnish to the secretary a complete list and description of such lands in which they are respectively interested; and those who shall subscribe thereafter, shall, immediately upon subscribing, furnish such list and description to said secretary; and no member while in default in furnishing such list and description, after the lapse of twenty days, shall participate in any of the proceedings of the association. Article 5. At all meetings of the association each member

shall be entitled to one vote, in person or by proxy, for each acre of land represented by him, provided he shall have complied with the provision of the fourth article, and paid all assessments when due from him, and not otherwise. If any member shall alienate any part or all of his lands, he shall immediately notify the secretary thereof, and after such notice the number of his votes, and his liability to pay future assessments by the board of directors, and other liabilities as such member, shall be correspondingly diminished, and if he shall dispose of any interest less than a fee simple estate in any part or all of his lands, the number of his votes and his liability for future assessments shall be correspondingly diminished upon the vendee becoming a member of this association. And the vendee, after becoming a member, shall be entitled to a number of votes corresponding to the estate he shall thus have acquired, and shall be liable to pay an amount of such assessments corresponding to such estate; and at all such meetings, members representing a majority of acres of the lands upon which the owners are then entitled to vote, shall constitute a quorum for the transaction of business. Article 6. Whenever it shall become necessary or desirable for the association to provide means to defray expenses that shall be necessarily incurred before such means can be realized from regular assessments for benefits to lands, and whenever thereafter means shall be required for any legitimate purpose (other than the construction of the work), the board of directors shall make an assessment upon the several members, in proportion to the number of acres of land represented by each; of all which assessments notice shall be given in each of the counties in which any of the lands are situated, and in which a newspaper of general circulation is printed and published, by a publication of such notice for one week in one of such newspapers in each of such counties, which notice shall specify the time, not less than ten days, within which the payment of such assessments shall ever be made by said board of directors, to provide means to pay for any part of the

actual construction of the proposed work, nor for any pur-
pose other than the purchase of lands, after the assessment
for benefit for lands shall have been completed. Nor shall
such assessments, made by the board of directors upon the
members, in the aggregate, exceed fifty cents for each acre
of land represented. Nor shall the payment thereof be
required faster than the same shall be needed for the pur-
poses for which it is assessed. Article 8. On the 16th day
of December, A. D. 1868, and annually thereafter, there
shall be a meeting of members at a place to be from time
to time appointed by a vote of the members, or designated
as shall be provided in the by-laws, for the election of three
directors, to manage the affairs of the association, and the
directors, when elected, shall immediately organize by elect-
ing one of their number president, and a member of the
association secretary, and another member thereof treasu-
rer; and they shall then, and from time to time thereafter,
appoint such other officers and agents as may seem neces-
sary. And the directors, upon their own motion, may, and
if required by members who are owners of one-half of the
land held by members, shall, call a special meeting of the
members; and at least twenty days' notice shall be given
of the time and place of holding said meeting, in the man-
ner prescribed by law for giving notice of general meetings.
Article 9. In no case whatever shall the association (except
upon the written consent of every member) create any debt,
liability, or obligation beyond the means then on hand, or
securely and certainly provided to pay or discharge the
same, after paying all existing debts and liabilities of every
character. And if the directors, or any agent of the asso-
ciation, shall, in the name and on behalf of the association,
contract any debt or incur any liability, whereby the asso-
ciation may become liable to pay any amount exceeding the
means of the association at the date of such contract or lia-
bility, on hand or securely provided to pay the same, after dis-
charging all debts and obligations previously incurred, such
party shall provide, out of his or their private estates, the

means requisite to discharge such liability or debt, and the same may be recovered by an action at law by said association, in any court of competent jurisdiction, without first having paid the same, and the amount so recovered shall never be reclaimed from the association; and the party so offending shall thereby forfeit his membership in the association, and all his interest in the property of the association.    Article 10.· All money which shall be received from the sale of the lands, or from sources other than assessments of benefits to lands to be benefited by the proposed work, and not needed for the legitimate purposes of the association, other than the prosecution of the proposed work, shall be from time to time divided *pro rata* :among the persons who advanced money for the purchase of land, and shall not have forfeited or relinquished their rights thereto, in proportion to the amount of money advanced by each, and interest thereon at the rate of ten per cent.; and any member may at any time relieve himself from liability to pay assessments for purchase of land, by relinquishing all claim to such *pro rata* dividend above mentioned.    Article 11.  A majority of the board of directors shall constitute a quorum, and said board shall frame a code of by-laws and rules for the government of the association, and the regulation of business transactions, and shall have the management of the affairs of the association.    Article 12.  All the provisions of these articles shall be binding and obligatory upon all members of the association, and they shall never be amended so as to permit the the association, directly or indirectly, to incur any debt or obligation exceeding the means of the association, at the time fully provided for or certainly secured, to discharge the same, after paying all other debts and obligations previously contracted or incurred, unless such amendment shall be expressly assented to in writing by every member."

And the plaintiff says that the defendant now claims that it has, at some time and in some manner, adopted the provisions of the act of May 22d, 1869, entitled "an act to au-

thorize and encourage the construction of levees, dikes, and drains, and the reclamation of wet and overflowed lands by incorporated companies, and to repeal all former laws relating to the same subject," and is now acting under the same, but when, and in what manner, the same were adopted, is unknown to the plaintiff. And the plaintiff further says that the defendant proposes and intends to straighten, widen, and deepen some parts of the channel of the Kankakee river, and to make a new channel for other parts of it, and thus to improve it from its source in the county of St. Joseph to the western line of the State of Indiana, and also to straighten, widen, and deepen the channel of Yellow river, through the counties of Marshall and Starke, and to straighten, widen, and deepen the channels of all lateral streams emptying into said Kankakee and Yellow rivers, on either side thereof, and to make assessments upon all the lands situated in the vicinity of said rivers and streams in the several counties aforesaid, that will be by the appraisers supposed to be affected by the said work, and benefited thereby, including the said land of the plaintiff, for the purpose of raising money to pay for all the costs and expenses of said work.

And the plaintiff further says, that the defendant has applied to the Court of Common Pleas of the county of Laporte, and has caused the appraisers to be appointed by said court, to examine all the lands by them supposed to be affected by the construction of the said work, including the said land of the plaintiff; and to assess against each tract of such land the amount of benefit which, in their opinion, the same will receive from the construction of said work; and also to assess the damages which it may sustain. And the said defendant has given public notice, by publishing the same in a newspaper in each of the counties in which any part of said proposed work is situated, that on the first day of July, 1869, the said appraisers would begin the examination of the lands and assessment of benefits and injuries thereto, at the intersection of the west line of

the State of Indiana with the Kankakee river, and would proceed eastwardly, examining the lands by ranges in the reverse order of their number in each county, and by counties in the following order: 1st, Lake; 2d, Newton; 3d, Jasper; 4th, Porter; 5th, Starke; 6th, Laporte, on the north side of the river; 7th, Laporte, on the south side of the river; 8th, St. Joseph, on the south side of the river; 9th, St. Joseph, on the north side of the river; 10th, Marshall; 11th, Pulaski; and thereafter they would revise and correct their assessments and return their schedules; which said notice was published in a newspaper in said county of Newton for three successive weeks, commencing on the 3d day of June, 1869, a copy of which notice is filed herewith: "To the Public.—The Kankakee Valley Draining Company gives notice to all whom it may concern, that the appraisers of the assessments of the benefits and injuries to the lands liable to be affected by the proposed work of the company, will begin the examination of the lands and assessment of benefits and injuries thereto, on Thursday, the first day of July, 1869, at the intersection of the west line of the State of Indiana with the Kankakee river, and will progress eastwardly, examining the lands by ranges in the reverse order of their numbers in each county, and by counties, in the following order: 1st, Lake; 2d, Newton; 3d, Jasper; 4th, Porter; 5th, Starke; 6th, Laporte, on the north side of the river; 7th, Laporte, on the south side of the river; 8th, St. Joseph, on the south side of river; 9th, St. Joseph, on the north side of the river; 10th, Marshall; 11th, Pulaski. And thereafter they will revise and correct the assessments, and complete and return their schedules.

"W. C. HANNAH, President K. V. D. Co."

And the plaintiff says that the defendant has given no other notice of the time when his said land will be examined by the appraisers and the assessment made against the same, and does not propose or intend to give any further or other notice thereof. And the plaintiff further says, that he is informed, and believes it to be true, that the said

O'Reiley and Others *v.* The Kankakee Valley Draining Company.

defendant proposes and intends to cause assessments to be made upon all the said lands to be affected and benefited by the said proposed work, including the said land of the plaintiff, without regard to the cost of said work, and to file such assessments in the recorder's office of the said counties respectively, and to make a lien upon said land from the time of such filing, and to enforce the collection of the same, or so much thereof as they shall deem necessary to pay the costs and expenses of the construction of said work. And the plaintiff further says that he is informed, and believes it to be true, and therefore charges, that the defendant proposes and intends to cause an estimate of the costs and expenses of the construction of the proposed work to be made, and, immediately after the filing of said assessment, to issue the bonds of the said corporation to an amount not exceeding the full amount of such estimated cost, and to pledge and mortgage the said assessments to secure the payment of said bonds, and immediately to negotiate and sell the said bonds in the market, and thus to prevent the plaintiff from making any objection to the said assessment against his said land, and from interposing any defense against the collection thereof. And the plaintiff says that his said land is in no manner noxious to the public health, and that the safety or health of the public will in no wise be promoted by draining or reclaiming the same, and that if the said defendant shall be permitted to cause an assessment to be made against said land of the plaintiff, and to file the same in the recorder's office of the said county, and thereby encumber the said land, and to pledge or mortgage such assessment for the security of any bond or bonds to be issued and negotiated by the defendant, it will cause irreparable damage and injury to the plaintiff. Wherefore, plaintiff prays that the defendant and its officers, agents, servants, and privies may be perpetually enjoined and restrained from making any assessment of benefits against the said land of the plaintiff, and from filing

any such assessment against the same in the recorder's office of said county, and from pledging or mortgaging any such assessment to secure the payment of any bond or bonds of the defendant, or in any manner encumbering or otherwise interfering with the said land of the plaintiff; and that the plaintiff may have other and proper relief.

The complaint was sworn to. Special answers were filed, to which demurrers were addressed, on the ground that the facts stated therein did not constitute a defense to the action. These demurrers were overruled to the answers and sustained to the complaint. Its sufficiency is, therefore, the question presented for our consideration.

The Kankakee Valley Draining Company, the appellee, was organized under the act of June 12th, 1852, entitled "an act to authorize the construction of levees and drains," and the acts supplementary to, and amendatory of, that act. But it claims now to exist and to exercise the powers it assumes, under the act of the last legislature, entitled "an act to authorize and encourage the construction of levees, dikes, and drains, and the reclamation of wet and overflowed lands by incorporated companies, and to repeal all former laws relating to the same subject." This act took effect May 22d, 1869. Laws of 1869, Spec. Sess., p. 82.

For greater convenience we will here present a summary of that act:—

Section one provides, that any number of persons, not less than three, being owners of lands wet or liable to be overflowed, may organize a company for the purpose of draining, reclaiming, and protecting such lands, which shall have power to straighten, widen, deepen, and make new channels for the whole or any part of any river, or water course, and to construct any dikes, drains, levees, and break-waters, and to do anything which they shall deem proper to accomplish the purposes for which the company shall have been organized.

Section two directs, that they shall file articles of association specifying the name and purposes of the company;

that they shall elect directors—not less than three nor more than seven—from their number, notice of the time and place of which election, signed by three members, having been posted five days in three public places near the work; and that vacancies in the board may be filled by the remaining directors.

Section three provides, that the articles of association shall be recorded in the recorder's office of the several counties in which any part of the work may be situated, and that from the time of filing in any such county, the company shall be a body corporate, with all powers incident to such bodies; "and to consummate the purposes for which it was organized; and to buy, receive donations of, and hold, and sell, and convey any lands benefited, or to be benefited, by the proposed work of the company;" and that any person owning land supposed to be liable to be affected by such work, may become a member of the company by signing the articles of association; and that the corporate existence of the company shall be judicially recognized, and that the records of the company shall be *prima facie* evidence of its acts.

Section four provides for the appointment of the time and place of an annual election, and for the giving of notice.

Section five provides, that a majority of the directors shall form a quorum, and have control and management of the business and affairs of the company. That they shall appoint a president, secretary, and treasurer, and such other officers and agents as they may see fit, all of whom shall be entitled to a fair compensation. That the treasurer shall give bond; that the president, directors, secretary, and treasurer shall hold office one year, and until successors are chosen, and that they shall be sworn, &c.

"SEC. 6. The company may apply to the circuit court or court of common pleas, in term time, or to a judge thereof in vacation, of a county in which any part of the proposed work shall be situated, which court or judge, as the case

may be, shall immediately appoint three disinterested appraisers, and such appraisers shall examine all lands the intrinsic or market value of which may be by them supposed to be liable to be affected by the construction of the proposed work, or by the appropriation of all or any part of it for right of way or other purpose of the company; or of any stone, timber, gravel, or other material required by the company, and shall make out separate schedules in the smallest United States Government subdivisions of all such lands situated in each county, and shall assess to each tract the full and entire amount of such benefit which it will, in the opinion of a majority of them, receive, without any regard to the cost of the work, and the injury which, in the opinion of a majority of them, it will sustain, and append to each schedule their affidavit that the same is a true assessment, and return the same to the secretary of the company, who shall cause it to be filed for record in the office of the recorder of the county in which the land therein described shall be situated; and from the date of filing thereof, such assessments shall respectively be a lien on the lands upon which they were assessed for the amount of such assessments of benefits, less the amount of injury assessed. And when, and as often as it shall become necessary or desirable to re-assess any tract of land for the correction of any mistake, or to enable the company to appropriate any part of the same for right of way, or any stone, timber, gravel, or other material for construction of the work; and whenever, and as often as it shall be desired by the company to make a re-assessment of any tract or tracts of land for any purpose, said appraisers shall, upon request of the company, make such re-assessments; and so from time to time, when and as often as they shall be requested, and shall make and return schedules of the same, and such schedules shall be filed for record, shall constitute liens, shall be collected, and shall in all respects be governed by the same rules and have the same force and effect as the original assessments above provided for. And if any ap-

praiser appointed as aforesaid shall die, resign, or fail to act as such when the interests of the company shall, in the opinion of the president, require it, his appointment as such appraiser shall thereby be vacated, and upon representation of such vacation to such court or judge by the president, such court or judge shall, upon the application of the company, immediately fill such vacancy by the appointment of a like disinterested person, who shall qualify and serve in the manner above provided; and the same shall be done when and as often as the company may request: *Provided,* That upon filing such schedule for record, the secretary shall give notice thereof by posting a notice in a conspicuous place in the recorder's office, and any party aggrieved by any such assessment may, within thirty days thereafter, appeal therefrom to the circuit or common pleas court of said county; and *provided further,* That any person who is under legal disabilities at the time of the making and filing of such schedule, shall have the right of appeal as aforesaid, at any time within thirty days after the removal of such disabilities; and *provided further,* That any two appraisers may perform all the services required by this section, and that all acts concurred in by any two shall be valid, binding, and effectual.

"SEC. 7. Before the actual construction of the work shall be begun, surveys of it and estimates of its cost shall be made, and the appraisers' schedules of assessments returned to the secretary, and if the estimated cost of the work shall exceed the aggregate amount of the assessments, the work shall not be further prosecuted.

"SEC. 8. Before the actual construction of the work shall be begun, the company shall divide the main line of their work into as many sections, of not exceeding six miles in length, as may be convenient, and each of such sections, with its auxiliaries, branches, and tributaries, shall form a separate division of the work; and they shall also appropriate and set apart as applicable to, and hold the same inviolate for, the construction of each of such divisions respec-

tively, a portion of their resources bearing the same ratio to the whole of their resources properly applicable to the construction of the work, as the estimated cost of such division shall bear to the estimated cost of the whole work; and so much thereof as shall be necessary shall be applied for the purpose for which it was appropriated and set apart, and the surplus may be applied to other legitimate purposes of the company, and the work of construction shall be prosecuted as nearly simultaneously upon the whole line as may seem to the directors consistent with proper economy.

"Sec. 9. The owners of land liable to be affected by the work of a company, shall have notice of the time and place, when and where, the appraisers will begin the examination of lands and the assessments of benefits and injuries thereto, and of the order in which it shall be intended to proceed with the same, which notice need not specify what lands are to be examined or assessed, but may be general and addresed to the public, and shall be sufficient if published for three successive weeks in a newspaper published in the county in which the lands are situated, and proof of its publication may be made by the affidavit of the printer or publisher of the paper in which it is published, or of the secretary of the company.

"Sec. 10. The board of directors may order the payment of said assessments in installments, not exceeding ten per centum per month, and payment thereof shall be made to the treasurer in compliance with such order: *Provided,* That no more shall be collected than shall, in the opinion of the directors, be required for the legitimate purposes of the company in the prosecution of the work; and *provided further,* That unless the main line of the company's proposed work shall exceed twenty miles in length, no part of the assessments shall be collected by the company until the company shall have given bond payable to the State of Indiana, with surety approved by the circuit or common pleas court or a judge thereof of a county in which the work or some part of it is situated, conditioned for the faithful

application to the legitimate purposes of the company of all money which shall be received by them for the construction of the work, which bond shall be filed in the clerk's office of the circuit court in the county where it was approved, and a copy thereof in the clerk's office of such court in each of the other counties in which any part of the work is situated; and any person or persons aggrieved by any breach of the condition of such bond, shall have an action thereon in any court of competent jurisdiction for the recovery of all damages thereby sustained by him or them.

"Sec. 11. Payment of assessments of benefits may be enforced by the foreclosure of the lien in any court of competent jurisdiction, in the same manner as is provided by law for the foreclosure of mortgages and the sale of mortgaged premises for the collection of debts, and payment of damages assessed for injuries to lands may be enforced by an action in a like court.

"Sec. 12. The company may appropriate any land, stone, timber, gravel, or other materials necessary for the right of way, or the construction, maintenance or improvement of their proposed work, by first paying into the county treasury of the county where the land is situated, for the use of the owner of the land, the amount of damages assessed by said appraisers to him therefor.

"Sec. 13. Any company whose work shall be estimated to cost three thousand dollars or more, may issue their bonds, with or without coupons, not exceeding in the aggregate the estimated cost of their work, which bonds may each be of any denomination, and payable at any time and place, and bear any rate of interest not exceeding ten per centum per annum, payable annually or semi-annually, and may secure the payment thereof by a pledge or pledges, or mortgage or mortgages upon said assessments for benefits to lands or any part thereof, or any other property of the company; which pledges and mortgages may each provide for a sinking fund for the gradual extinguishment of the

debts, and such company may, from time to time, negotiate said bonds in any market or place, at any rate of discount, not exceeding ten per centum; and after any such bond shall have been negotiated, no action or proceeding shall be instituted, nor any defense to any action interposed by the company or any other person or persons, the object or tendency of which shall be to impair the validity or security, or to depress the value of such bonds, any provision of law to the contrary notwithstanding.

"Sec. 14. After the expiration of three years from the recording of the appraisers' schedule of assessments in any county, no action shall be instituted to foreclose any lien on land situated in such county, unless the assessments secured by such lien shall have been pledged or mortgaged as security for one or more bonds then outstanding; and in such cases no tract of land shall, after the lapse of said three years, be liable for more than its fair proportion of the assessments pledged or mortgaged as security for the bonds of the company and required for the extinguishment thereof.

"Sec. 15. No informality, irregularity, or omission, which shall have occurred, or which may occur in the organization or proceedings of any company, or in the appointment or proceedings of any of their officers, agents, or the appraisers, shall affect the rights and privileges of such company, or invalidate the assessments of the appraisers, nor any sale of land which shall be made under any foreclosure of any lien for the assessment thereon, provided the amount of the assessment shall be clearly set forth in the appraisers' schedule, and the schedule shall have been duly recorded, and notice of the recording thereof given as hereinbefore provided."

Section sixteen provides, that all members shall be individually liable for all manual labor performed.

"Sec. 17. All laws contravening or conflicting with any of the provisions of this act, and all laws now, or at any time heretofore, in force, relating to incorporated companies or associations for constructing levees and drains, are hereby

repealed, but all actions now pending, and all rights of action which have accrued under any law hereby repealed, may be prosecuted to final judgment in the same manner as if such law had not been repealed; and all corporations heretofore organized, and now existing under any law hereby repealed, and the several members thereof, shall be entitled to the benefits and privileges conferred, and subject to the liabilities and restrictions imposed by this act: *Provided,* That nothing in this act contained shall be held or construed to modify, or repeal, in whole or in part, an act, entitled 'an act to enable the owners of wet lands to drain and reclaim them, when the same cannot be done without affecting the lands of others, prescribing the powers and duties of county boards and county auditors in the premises, and repealing all laws inconsistent therewith.' Approved March 11th, 1867."

Section eighteen declares an emergency.

The act reserved from the general repeal enacted by section seventeen, is an act of the character designated in its title. It authorizes the owner of wet lands to drain them, and to that end to acquire the necessary easement in contiguous lands. Laws of 1867, p. 186.

The first objection urged to the validity of the act is, that it does not sufficiently declare or manifest that the drainage of these lands is a matter of *public* importance.

If we admit that the use of the power conferred must be for the benefit of the public, it does not, therefore, follow that such purpose must, of necessity, be declared in the act. The courts cannot be controlled by such a declaration, but they must examine and decide whether the use is a public use. 2 Kent, 340; *Scudder* v. *The Trenton Delaware Falls Co.*, Saxt. 694; *Austin* v. *Murray*, 16 Pick. 121; *Coster* v. *The Tide Water Co.*, 18 N. J. Eq. 54.

This public use or benefit need not extend to the whole public, or any large portion of it, within the jurisdiction of the legislature. It may be limited to the inhabitants of a small locality, but the benefit must be in common, not to particular persons or estates. *Coster* v. *The Tide Water Co.*,

*supra.* The right of eminent domain can only be exercised for such a public use. Under this power, lands for the construction of canals, railroads, bridges, and turnpikes are taken and compensation paid. The necessity must limit the exercise of the power so far as to require that no greater estate be taken in the land than is essential to the purpose contemplated. *Edgerton* v. *Huff,* 26 Ind. 35.

The use contemplated is for all alike, and upon the same terms. It is for the public, however few the number of that public may be who are expected to avail themselves of its benefits. It is common to all. This cannot be said of the act in question, except so far as the public health may be involved.

But, in our judgment, the laws authorizing the draining of swamp lands may rest upon another legislative power. This power is so clearly stated, in the case already cited from 18 N. J. Eq., *supra,* that we prefer to quote at some length from the opinion. The question arose upon the constitutionality of an act incorporating certain persons, who had no interest in the lands affected by the contemplated drain, authorizing them to contract with three commissioners, appointed by the court, to drain certain lands, miles apart, whose system of drainage was entirely independent. The act proposed to give ten strangers, having no interest in common with the owners, and against their wills, an annual rent charge, or incumbrance, forever, upon their lands, the amount to be fixed by the three commissioners appointed on application of the company. These commissioners were not required to be freeholders or residents, to be impartial, or to be sworn. They were to contract with the company to drain the land. They were to determine the location of the drains and fix an annual compensation therefor. No limit was placed upon their discretion. The cost of the work formed no prescribed guide in this fixing of an annual tax for all time. Semi-annual dividends were required to be declared from the profits of the company. In the decision of the case this language is used:

NOVEMBER TERM, 1869.  187

O'Reiley and Others *v.* The Kankakee Valley Draining Company.

"It is the power of the government to prescribe public regulations for the better and more economical management of property of persons whose property adjoins, or which, from some other reason, can be better managed and improved by some joint operation, such as the power regulating the building of party walls; making and maintaining partition fences and ditches; constructing ditches and sewers for the draining of uplands or marshes, which can more advantageously be drained by a common sewer or ditch. This is a well known legislative power, recognized and treated by all jurisconsults and writers upon law through the civilized world; a branch of legislative power exercised by this State before and since the revolution, and before and since the adoption of the present constitution, and repeatedly recognized by our courts. The legislature has power to regulate these subjects, either by general law or by particular laws for certain localities or particular and defined tracts of land. When the constitution vested the legislative power in the senate and general assembly, it conferred the power to make these public regulations as a well understood part of that legislative power.

"But this is a power to be exercised for the benefit of the parties affected, not for that of strangers. If the building and maintenance of party walls was authorized and regulated, it was to be done by the adjoining lot owners, or one of them, not upon application of some enterprising or favored mechanics for the right to build party walls between all the lots in a certain town, at a goodly profit, and this, whether the owners wanted party walls or not.

"Many private acts have been passed in this State for the the draining of meadows, allowing commissioners appointed by the legislature, or as they are in this case, to lay out the ditches and drains, and to assess and collect the expense of the drainage, including the compensation of the commissioners, out of the lands drained. I have been referred to, and examined, hundreds of such acts, in this State and the State of New York.

"Among others, is the act to drain the Riser in Bergen county, approved March the 7th, 1850, (Pamph. Laws, 292); which act was, by Chancellor Williamson, in the suit of *Berdan* v. *The Riser Drainage Company,* held to be constitutional, and an injuction refused.

"But all these acts are understood to have been passed by the legislature, upon the application of some of the owners of the land affected by them, generally a majority, and always passed only for their benefit. Whether it is necessary to the validity of such an act, that it should be passed on the application of the owners, or some of them, I do not now mean to decide. It seems that to make a police regulation for the benefit of several adjoining owners, such, in the true sense of the phrase, it ought to be invoked or put in motion by the parties to be benefited, or some of them, and not by strangers, who expect to profit by the execution of it; as a public war should be declared for the benefit of the country, and not of the hangers-on and retainers of the army engaged in it.

"But there is another peculiarity in all these police laws that is of their very nature and essence, which is, that they assess on the persons or property benefited, only the expense of executing the improvement. The object of passing them, and the only reason of the existence of this power in the legislature is, that parties may be enabled, by making the improvement in common, to save useless expense, or that one person may be allowed to do something necessary to the use of his property, by using his neighbor's land in a way beneficial to both. A profit carved out for strangers is inconsistent with this.

"I find no case reported, and among the number of acts examined I do not find a single one, where any burthen is imposed upon the lands drained, except the actual expense of drainage. The principle of them all is, to make an improvement common to all concerned, at the common expense of all. And to effect this object, the acts provide that the works to effect the drainage may be located on any

part of the lands drained, paying the owner of the land thus occupied, compensation for the damage by such use. So far private property is taken by them; farther it is not. In none of them is the owner divested of his fee, and in most there is no corporation in which it could be vested, and for all other purposes the title of the land remained in the owner. To effect such common drainage, power was in some cases given to continue these drains through adjacent lands not drained, upon compensation. All this was an ancient and well known exercise of legislative power, and may well be considered as included in the grant of legislative power in the constitution. Beyond this, the limit above laid down must prevail, and we must hold that private property cannot be taken for private uses, even with compensation. Whether the power to divest the owner of his fee, contained in this act, which is not necessary or even useful for the purpose of drainage, would, in an act otherwise within the scope of legislative power, be valid, need not now be discussed.

"The act under consideration does not fall within the principles on which these laws regulating the use and enjoyment of property, known as police laws, are based. While it provides for the drainage of lands, it is not enacted at the request, or for the benefit of the landholders, but that the company may make a profit out of the scheme. And were not this object specially provided for, so as to appear from the whole act to be the main end in view; if the act did not limit all charges to actual expenses, but permitted more to be levied and charged, in such manner that the courts could not control the excess; I should hold it void."

In the case of *Cypress Pond Draining Co.* v. *Hooper*, 2 Met., Ky. 350, where the act of the legislature authorized certain persons to levy a yearly tax not exceeding twenty-five cents per acre, on all the lands in a certain locality, for the purpose of draining certain lands within that district, it was held that the act was void solely in that the burthen had been imposed without any view to the interest of the

parties in the object to be accomplished. In other words, the benefit received did not determine the ratio of the amount assessed.

In *Reeves* v. *The Treasurer of Wood Co.*, 8 Ohio St. 333, in passing upon the constitutionality of an act to authorize the location of ditches in certain cases, it was ruled that the legislature had the power to authorize special and local impositions upon property in the immediate vicinity of an improvement which were necessary to pay for the improvement and laid with reference to the special benefit which such property derived from the expenditure.

In *Hartwell* v. *Armstrong*, 19 Barb. 166, the court, indeed, attempted to rest this power upon the right of eminent domain, and having erroneously placed it there, decided that the benefit conferred was not the proper test of assessment. The distinction between the taking of private property by the right of eminent domain, and the assessment for local improvements in proportion to the benefit received, was recognized by the Court of Appeals of that State, in *People* v. *Mayor, &c., of Brooklyn*, 4 N. Y. 419;—the exercise of the one taking property, not as the owner's share of the public burthen, but as so much in excess of his proportion; the other as his due contribution for special benefit received. The power to authorize the reclaiming of certain districts from inundation was recognized in *Egyptian Levee Co.* v. *Hardin*, 27 Mo. 495, and the propriety of charging the expense against the reclaimed land was asserted. So in *Ex Parte New Orleans Draining Co.*, 11 Lou. An. 338.

These citations are deemed sufficient to show the current of decisions on this subject. Somewhat fuller references are made in the case of *Palmer* v. *Stumph*, 29 Ind. 329.

The power of the legislature to authorize the organization of companies for the purpose of draining swamp lands, has been repeatedly affirmed in this court, though the ground upon which the power rested has not been very clearly declared. In *Anderson* v. *The Kerns Draining Co.*, 14 Ind. 199, it is not stated whether it springs from the

right of eminent domain, or the power of taxation, and the language would seem to rest the right alone upon the question of the beneficial influence of such drainage upon the public health.

The citations we have made clearly derive the authority from the power existing in the legislative department of the government commonly called the police power—the right to require the owner of property to so use his own, that his neighbor may have such reasonable enjoyment in his own possessions as naturally adheres to such a species of property.

This power may be abused, but all power may be arbitrarily exercised. This will not authorize the judicial department to deny a long recognized authority in the legislative branch. Its abuse must be prevented by the court, but its reasonable exercise cannot be denied.

The question is, therefore, whether the law under consideration is an abuse of this power. It is claimed that the act and the organization under it of this company are on such an extensive scale that the rule regulating the use of property among neighbors can have no application; and the averment in the original complaint, that the land of the plaintiff is in no manner noxious to the public health, and that the safety or health of the public will in no wise be promoted by draining or reclaiming the same, seems to form a foundation for the objection. But in making a drain to reclaim swamp lands, all whose lands are affected must be regarded as having a common interest, and one through whose land the drain must of necessity pass could not object that his land was not of itself noxious to the public health. If such an objection can be made, it must go further, and aver that the drain, in its general purpose, would not benefit the public. One man cannot restrict an improvement for the public good because his land does not directly injure the public. It does inflict such injury if it prevents a public good from being accomplished. If the power, therefore, to construct the drain be limited to a

public purpose, still the objection made cannot be sustained.

It is objected, that the law does not ascertain the swamp lands to be affected.   This is a question of fact, and provision is made for determining the benefit and injury to all lands through which the drain may pass.   This involves the determination of this question by the persons who may be designated under the provisions of the act.

The act is objected to, also, in that it does not limit the assessment to the actual cost of the work.   But this criticism, we think, is an error.   The tenth section provides, "that no more shall be collected than shall, in the opinion of the directors, be required for the legitimate purposes of the company in the prosecution of the work."   While the act authorizes the company to purchase lands which have been drained and are sold for the purpose of paying the assessments, it is clear that such investments are not one of the "legitimate purposes of the company in the prosecution of the work."   Such investments must be provided from the private means of the company.   No surplus can be accumulated by taxation of the lands.   The limit of taxation is the actual expense of the improvement.

But it is again insisted, that the articles of association do not specify the purpose for which the company is organized, within the intent of the act as explained in the third section, which provides, that any person owning land supposed to be liable to be affected by such work, may become a member of the company by signing the articles of association.   This privilege all interested can avail themselves of, if the law is fully and fairly complied with.   If the purpose of the company be plainly declared, every one can tell by an examination of its articles whether he may be liable to become involved in its operations.   If so interested, he may become a member and share equally with the original corporators in the control.   In this case, it is declared, that "the objects of the association are: 1. To reclaim or improve the lands of the valleys of the Kankakee river and

its tributaries, by clearing out and deepening the present channel of said river in some places, and by excavating and opening new and more direct channels or drains therefor in other places, accordingly as the same may seem best adapted to economically and effectually drain said valley and reclaim and improve said lands; and also by cutting and opening such lateral ditches, and in such manner clearing out, deepening, and straightening the channels of such tributaries as may be necessary to convey all the waters of the tributaries thereof, and of such adjacent lakes, ponds, swamps, and marshes as the association shall think it practicable and best to drain; and permit the same to flow freely into such new or improved channel to said river, so as that the lands of said valley, which are now injured or rendered valueless by the waters of said river, or any tributary thereof, or by any such lake, pond, swamp, or marsh, adjacent thereto, may be reclaimed or improved, the health of the country promoted, and the owners of the land and the public generally benefited. And second, to purchase from time to time, and to receive donations of lands which shall have been, or which may thereafter be, benefited by the performance of said work, and to hold the same as the property of the association; and from time to time sell and convey parcels of the same, as and when the association shall deem its interests promoted thereby. The proposed work is to be performed along the Kankakee valley, between the place where the river crosses the line between the states of Indiana and Illinois, and a point on said river in St. Joseph county to be hereafter determined by a survey, and will extend through and into the counties of Lake, Newton, Jasper, Porter, Laporte, Starke, and St. Joseph, the distance between the terminal points being about seventy miles in a straight line. All the lands believed to be liable to be affected by the proposed work lie within the territory embracing the counties aforesaid and Marshall county, portions thereof being situated in each of said counties."

VOL. XXXII.—13.

In *West* v. *The Bullskin Prairie Ditching Company*, decided the present term, *ante*, page 138, we held, that the prior act on this subject " left no opportunity for the abuses which might result if the corporation could be formed without an object declared with reasonable distinctness. It made such a declaration a condition precedent to the organization, and without it no corporation is authorized or can exist. The requirement is essential by the terms of the act, and its wisdom is so apparent that the courts can have no temptation to relax it by construction." There the description of the drain contemplated was held so defective as to be wholly useless in determining what lands would be affected by its construction, and the organization was declared void. In the case now in judgment, the point designated as the place where the Kankakee river crosses the line between the states of Illinois and Indiana can be easily ascertained, but the " point on said river in St. Joseph county, to be hereafter determined by a survey," is simply no description at all. Parties whose interests are to be affected are not to be kept in ignorance of the purpose of the company until the surveys are made and accepted by the company. They are entitled to have a voice in every corporate act, and to have notice by the articles themselves whether or not their interests are to be affected by the work contemplated. So, as to the description of the work to be done between the two points, " by clearing out and deepening the present channel of said river *in some places*, and by excavating and opening new and more direct channels or drains therefor *in other places*, accordingly as the same may seem best adapted to economically and effectually drain said valley and reclaim and improve said lands." Where are the " other places" in which new channels or drains are to be made? and on which side of the present bed of the river are they to be located? and what lands will be affected by them? are questions of importance to every owner of swamp land in that region, and on the answers must depend his interest in the proposed work. Again, as to the lateral branches, their location and

construction is made to depend upon the future views of the association.

This, in our judgment, is not a compliance with an essential prerequisite to the organization of the corporation. The lands to be affected by the proposed work must be described in the articles of association, or such a plain description of the commencement, the line, and the termination of the ditch, as will enable all persons to form with reasonable certainty an opinion regarding their personal interest in the corporation.

The demurrer should have been overruled to the complaint, as it disclosed the fact that no such association as the appellee was legally authorized to make any assessments upon the lands of the appellants.

Judgment reversed, and cause remanded for further proceedings in accordance with this opinion. Costs here.

*J. Bradley, T. A. Hendricks, O. B. Hord, A. W. Hendricks,* and *W. C. Wilson,* for appellants.

*J. B. & W. Niles, L. A. Cole,* and *E. L. Bennett,* for appellee.