CLARK and others *vs.* THE MAYOR AND COMMON COUNCIL OF THE CITY OF SYRACUSE.

Where an act of the legislature declared a creek to be a public highway, and prohibited the obstruction of the navigation thereof, by the erection of dams or otherwise, and a subsequent act authorized a person therein named, to erect a dam across said creek; *Held,* that the only effect of the last act was to remove the restriction imposed by the former act, and relieve the person building a dam in pursuance of the authority given to him, from liability to prosecution, by indictment or otherwise, for obstructing the navigation.

And where, under an authority thus given by an act of the legislature, passed in 1824, P. erected a dam across the Onondaga creek, built a valuable mill, and constructed a ditch or mill race, to conduct the water from the dam to the mill; *Held,* that the mayor and common council of the city of Syracuse had no right, in the exercise of their municipal powers, without trial, or notice to the owners of such dam, to direct the same to be torn down and

removed, on the pretense that it was a *nuisance*, endangering the health of the city.

*Held also*, that the injury threatened, being a permanent injury to the freehold, under a claim of right which was unfounded; and it being at least doubtful whether an adequate compensation by way of damages could be had, it was a proper case for an injunction.

THIS action was brought to restrain the defendants from prostrating a dam across Onondaga creek, owned by the plaintiffs, and by which their mills were supplied with water; the defendants having declared the dam to be a nuisance, and directed the same to be abated by the owners, and in case of their default, by the street commissioner. The cause came before the court upon an appeal from the judgment at special term, overruling a demurrer to the complaint.

*Jas. Noxon*, for the plaintiffs.

*I. L. Newcomb*, for the defendants.

*By the Court*, W. F. ALLEN, J. The plaintiffs seek to enjoin the defendants from tearing down and removing their dam as a nuisance. The complaint alledges that one Sylvester F. Peck, in pursuance of authority granted by the legislature of this state, by chapter 315, of the laws of 1824, erected a dam across the Onondaga creek, on Marsh lot No. 37, in the Onondaga salt springs reservation, and erected a mill on lot No. 28, and constructed a ditch or mill race from the dam so constructed to the mill; and that the said mill and premises now belong to the plaintiffs in fee, and are worth thirty thousand dollars; that the destruction and removal of the dam will entirely destroy the value of the said property. It is alledged that the mill and privileges have been used by the said Peck and his assigns from about the year 1824. That the defendants, on the eleventh day of December, 1850, declared said dam and mill pond, which are situated within said city, a public nuisance and detrimental to the health of the city, and directed the street commissioner to remove said dam, unless the owners thereof should do so by

the first of March, 1851.  The defendants demurred to the complaint, for several causes.  Judgment was given at the special term in favor of the plaintiffs.

The act of 1824, authorizing the erection of the dam in question, was rendered necessary by reason of the restriction imposed upon the owners of the land through and over which the Onondaga creek flowed, by a former act of the legislature declaring the creek to be a public highway, and prohibiting the obstruction of the navigation thereof by the erection of dams or otherwise.  (2 *R. L.* 285.)  But for this restriction the owners of the premises would have had the right to erect the dam and use the water in the manner prescribed by the act of 1824, without the sanction of the legislature ; and the only effect of the act last quoted is to remove the restriction imposed by the former act, and relieve the parties from their liability to prosecution by indictment or otherwise, for obstructing the navigation.  (*Crittenden* v. *Wilson,* 5 *Cowen,* 165.    *Renwick* v. *Morris,* 3 *Hill,* 621.)  The question, therefore, is the same that it would have been if the stream had been and was the property of the plaintiffs, and on which the public had no easement, and no legislation had been had in respect thereto ; and is, whether the defendants, in the exercise of their municipal powers, have the right, without trial or notice to the party interested, to destroy a large and valuable property, under the pretense that the property is a nuisance, endangering the health of the city.  The defendants claim the right, under their act of incorporation, to adjudge the premises to be a nuisance, and then to abate the nuisance by a destruction of the property.  It is not the attempt of an individual to abate a nuisance, upon his own responsibility, and relying upon his ability to prove the existence of the nuisance, in excuse of the trespass, which in some cases is allowable, although it may be questioned whether the rule would apply to a case like this.  The defendants claim that their adjudication upon the question of nuisance, is final, against the owners of the property, and a protection to any one acting under their authority in the removal of the dam.  And inasmuch as this claim is one of great interest to dwellers in our cities, and

may, if well founded, result in the destruction of vast amounts of property at the whim or caprice of an irresponsible common council; it should not be sanctioned unless clearly granted. It should not be upheld by implication. If property to any amount can be thus taken and destroyed upon the pretence that the health, comfort, and convenience of the city require it, there is no limit to the value of property which may be thus taken. It is worthy of remark that none of the safeguards are thrown around the exercise of this power, if it exists, which are usually deemed necessary to protect the property of the citizen. The property holder is not entitled to any notice of the proceedings in which he may be so vitally interested. The fact upon which property is to be condemned and destroyed, is not to be found by a jury and upon the examination of witnesses in the presence of the parties, but may be adjudged upon the view of the members of the common council, or perhaps a bare quorum of that body, or even some smaller number, in the absence of the owner, and possibly with the aid of some persons interested adversely to him. No provision is made for compensating the owner for the sacrifice of his property for the public benefit. The counsel for the defendants has referred us to that class of cases which have grown out of the destruction of property in the city of New-York, to arrest a conflagration and prevent the extending of a fire, in pursuance of an order of the mayor and two aldermen of the city. It is very evident that there is no principle involved in the decision of those actions which can aid us at all in the decision of the question involved in this. It would be sufficient upon this point to say that the power exercised by the officers of the city government in the cases referred to, is expressly recognized and regulated by statute; and the first question with us is, whether the power claimed has been in fact conferred upon the mayor and common council of the city of Syracuse. But a still more conclusive answer is, that the power to destroy the buildings, to arrest the fire, is not the exercise of the right of eminent domain, and the taking of private property for public purposes; neither is it the exercise of any legislative or judicial power delegated to the city government by the state.

The right existed independent of the statute; and its exercise was only regulated and placed in the hands of discreet men. The overruling necessity justifies the taking of private property to prevent the destruction of a much larger amount of private property. The statute, as a matter of supposed equity, not as a matter of right, provided for compensation to the owners of the property thus destroyed. (*The Mayor, &c. of New-York* v. *Lord,* 17 *Wend.* 285; *S. C.* 18 *Id.* 126. *Russell* v. *Mayor, &c. of New-York,* 2 *Denio,* 461.) Another class of cases is referred to and relied upon by the counsel for the city, in which the right of city governments to interfere to some extent with private property in the execution of police regulations for the safety or health of the public, has been acknowledged. But none, I think, go to the extent of authorizing private property to be taken or destroyed for the public benefit, without compensation made therefor. Cities, doubtless, acting within the powers conferred by their charters and the constitution, may, when necessary to the safety or health of the city, direct and control the occupation of property; and may, in so doing, to some extent, interfere with private rights without providing for compensation. The damages in such cases are considered *damnum absque injuria,* and the law presumes that the party damnified is compensated by sharing in the advantages arising from such beneficial regulations. (*Dow* v. *Gray,* 2 *T. R.* 358. 4 *Id.* 794.) The case is different when, as in this case, it is sought to deprive the owner of his property, entirely, by destroying it. In *Baker* v. *The City of Boston,* (12 *Pick.* 184,) the court held that the city authorities were authorized to fill up a certain creek, in the exercise of their powers for the preservation of the health of the city. But in that case no property was destroyed. The court say, "It does not appear that the plaintiff has acquired any right to boat navigation on the creek," and they expressly held that if in connection with measures of municipal regulation, private property is appropriated to public use, compensation must be made therefor, or the appropriation will be unconstitutional and void. But we are not called upon to decide that a necessary destruction of property in the abatement of a nuisance

is an appropriation of property to the public use, calling for a compensation to the owner, within the constitution. Upon a conviction on indictment, it is competent to abate the nuisance by removal of a dam, or otherwise, and in such case no compensation is required to justify this destruction of private property for the preservation of the health of the public. It is not necessary to consider the question whether the exercise of a like power by municipal authority in the abatement of a nuisance, requires that provision should be made for compensation to the owner of the property destroyed. Neither is it necessary to decide whether a power vested in a municipal corporation summarily, and upon view or otherwise, to destroy the property of individuals in the abatement of a nuisance, or what should by the authorities. be declared to be a nuisance dangerous to the health and comfort of the public, would be an infringement of that provision of the constitution which provides that no person shall " be deprived of life, liberty, or property, without due process of law." If the authority claimed to be exercised by the defendants is given them by their charter, then these questions would be important, and perhaps not free from difficulty. But it must be conceded that the city government is of limited authority, and can only exercise those powers expressly delegated to it, or necessarily incident to such powers. The first difficulty in the case is a want of authority in the defendants, under their charter, to do the act threatened. The powers of the common council are prescribed and regulated by section seven of title three of the act incorporating the city, passed December 14th, 1847. (*Laws of* 1847, *p.* 660.) By several of the subdivisions of that section, power is given to suppress and abate nuisances of different kinds ; some affecting the health, and others the morals and good order and quiet of the city. Subdivisions 9, 17, and a part of subdivision 10, relate to nuisances affecting the health and comfort of the citizens ; and of these, subdivision nine contains the only provision bearing upon the question before us. The ,counsel for the defendants did not refer to this provision, or claim any authority under it, but relied upon the last clause of the section, which he read as a part of

subdivision 31, and as providing for nuisances of a different character from those before provided for. But the clause referred to is not designed to confer new powers, or provide for new cases. It simply provides for the more certain and speedy execution of the power before conferred in relation to the abatement of nuisances, and reference must be had to the other provisions to determine what are nuisances within the purview of this part of the section. Subdivision nine provides that the common council shall have power to compel the owner or occupant of any grocery, cellar, tallow chandler's shop, soap factory, tannery, stall, privy, sewer, *or other unwholesome or nauseous house or place, to cleanse or remove or abate the same,* &c. The last clause of the section authorizes the common council to determine upon view, or examination of witnesses, what shall be deemed a nuisance within said city, that is, a nuisance of the character of those before named, and authority to abate which is given to the city authorities. (*Broom's Legal Maxims,* 276.) The premises of the plaintiffs do not come within the particular description of the places especially named in this section; neither are they of the same general class with any of the places so named. A mill and dam cannot, like the buildings and shops named, be removed and the business be carried on in another part of the city. The nuisance caused by a mill dam is entirely unlike those named; and to be abated in an entirely different manner. The interests involved in the question of its abatement are essentially different from those involved in the other cases. To abate this alledged nuisance by a removal of the dam, necessarily requires a destruction of property. Not so in the other cases. The last clause of the section, and which the counsel for the city supposed, (erroneously, as I think,) embraced a new class of cases and enlarged the powers of the common council, only authorizes the council, on default made by the owner, to abate the nuisances over which jurisdiction is given. In relation to one class of such nuisances, to wit, those arising from stagnant pools of water, it makes particular provision and authorizes the nuisance to be abated by the city government, and the expenses of such abatement to be assessed upon

the lots benefited, or on the city at large; providing, at the same time, that no assessment for such purpose should exceed two hundred and fifty dollars. Thus providing for an equitable assessment of the expenses of abating or removing a nuisance by filling up a lot, and not causing the same to be done at the expense of the owner, and limiting that expense to a small sum, and making no provision for the destruction of private property, or for compensation in case property should be destroyed in order to abate the nuisance. A regard for the rights of property owners, and the economical administration of the city government, is manifested in these provisions entirely inconsistent with the claim now made by the defendants to exercise dominion over the property of the citizen. It is quite evident that the premises of the plaintiffs have recently, if at all, become obnoxious, after their occupation for a quarter of a century, by reason of the great change which has taken place in the surrounding premises; and that the growth and growing wants of a large city have rendered that a nuisance which was innocuous and probably a public benefit when first created. It is not probable that the legislature designed to confer the power to destroy property so valuable as this, and thus situated, without compensation, when they have so cautiously guarded the exercise of the power to fill up lots by limiting the expense to be incurred to the almost nominal sum of two hundred and fifty dollars, and made such expense a charge upon the public. There appears to be no necessity for the exercise of this power by the common council. The remedy by indictment, and the common law right resting in individuals to abate the nuisance, (if such right exists in a case like this,) together with the power vested in the common pleas of the county (and which is now vested in the county court) to revoke the license granted by the act of 1824, are entirely sufficient to protect the public against the claim. In *The Brick Presb. Church* v. *The Mayor, &c. of New-York,* (5 *Cowen,* 538,) the validity of the ordinance of the common council was conceded by the counsel of both parties. *Vanderbilt* v. *Adams,* (7 *Cowen,* 349,) involved the construction of a clause in the charter of the city of New-York, giving the harbor masters of

that city authority to regulate and station ships and vessels·
in the East and North rivers, and simply decides that the
harbor master has jurisdiction, under the act, over all private
wharves, as a necessary police regulation, and as resulting from
the power vested in the city government, from whom the wharf
owners derived title. In *Hart* v. *The Mayor, &c. of Albany*,
(9 *Wend.* 571,) it was held that the defendants, under their
charter authorizing them to remove and abate any nuisances in
and about the docks and wharves, and to prevent all obstruc-
tions in the river opposite the wharves, docks, or slips, they had
authority to remove an ark or float moored in the basin, ob-
structing the navigation. The want of right in the plaintiffs
was clear, and the authority in the defendants was expressly
given, and its exercise consisted in the removal of property
which was capable of removal without destruction, and no ques-
tion was decided in the case which throws any light upon the
question I am now considering.

*Van Wormer* v. *The Mayor, &c. of Albany*, (15 *Wend.* 262,)
was an action to recover for the pulling down by an agent of the
defendants, of a barn and shed of the plaintiff. The ground
upon which the buildings stood had been declared a nuisance by
the board of health of the city, and had been ordered to be lev-
eled. The buildings were pulled down to carry this ordinance
into effect. The destruction of the buildings was incidental to
the leveling of the ground upon which they stood, and was not
ordered by the defendants. The transaction was in 1832, at the
time of the first visitation of the country by the Asiatic cholera,
and the defendants were held justified by the circumstances of
the case and the very large discretionary powers which had
been vested in the board of health, which it will be seen by refer-
ence to the acts were much more comprehensive than those dele-
gated to the defendants by their charter. (1 *R. S.* 440. *Laws
of* 1832, *p.* 581, 2, § 5.) The plaintiff in that case had notice of
the proceedings, and admitted the character of the premises and
the necessity for digging them down. It was a case *sui generis*,
and should not be applied to a case differing in circumstances as
this does. *The People* v. *The Corporation of Albany*, (11

Clark *v.* Mayor, &c. of Syracuse.

*Wend.* 539,) involved principles very analogous to those involved in this case. The defendants were indicted for neglecting to remove a nuisance, and suffering the basin to become filled up and obstructed. The duty was conferred upon them, by their charter, to abate or remove any nuisance in any street or wharf, to prevent all obstructions in the river, near or opposite to the wharves, docks or slips. A bulkhead at the foot of the basin was the cause of the nuisance, and had been erected by a joint stock company under the authority of an act of the legislature, with the consent of the defendants, and like the dam in this case was private property. The powers of the corporation were as ample as the powers of the city government of Syracuse. The judge delivering the opinion of the court, says : "There can be no doubt the corporation have the legal power to remove the cause of the nuisance complained of, *if that can be effected by deepening and cleansing the basin ;* and I apprehend it is impossible to distinguish in reference to the subject in question between their power and their duty." * * "The court, I think, erred in instructing the jury that the defendants were bound to abate the nuisance, even if to do so it was necessary to cut down the bulkhead." And it was held that no such power was vested in the defendants by their charter, and that the maxim that the public safety is the paramount law did not impose any duty upon the city authorities, and that they had no power but what was derived from their charter, or by special acts of the legislature. The rights of the owners of the bulkhead were no more sacred or better secured than the rights of the plaintiffs in this case ; and the powers of the city of Albany were substantially the same as those of the city of Syracuse ; and as there was no authority there to destroy the bulkhead, so here there is no authority to destroy the dam.

The only other question is, whether it is a proper case for an injunction ; and upon this point there can be, I think, no serious doubt. The injury threatened is a permanent injury to the freehold, under a claim of right which I think entirely unfounded. It is at least doubtful whether an adequate compensation by way of damages could be had, and if it could, the interests of all

Vol. XIII.            6

parties require a preventive remedy if that can be applied. (*Story's Eq. Jur.* § 927, *and cases cited in notes.*)

The judgment should be affirmed.

PRATT, J. was of the opinion that the common law remedy by indictment did not exist, and that the only remedy was by application to the county court, under the act authorizing the dam to be erected.

Judgment affirmed.

[Oswego General Term, April 5, 1852.   *W. F. Allen, Hubbard* and *Pratt,* Justices.]