## SUPREME COURT.

In the Matter of the Petition of the RECTOR, CHURCH-WARDENS AND VESTRYMEN OF THE CHURCH OF THE HOLY SEPULCHRE, to vacate an assessment.

*New York (city of) — Assessment for underground drains — When appropriation of lots for drains without compensation illegal — Where the assessed valuation of lots prior to the assessment for underground drains was "nothing" the assessment is properly vacated — Mere figures under heading of "value of real estate" on a tax roll without a dollar mark, do not show valuation.*

The commissioner of public works run an underground drain through lots of the petitioners, which had already been thoroughly drained by means of ordinary sewers, for which an assessment had been duly paid:

*Held*, that an assessment for such underground drain was properly vacated, the appropriation of petitioner's lots for such drains without compensation being illegal.

*Held*, also, that the claim that the lots were drained for their own benefit and because it was essential to the public health and welfare, is not sustained by the proof.

*Held*, further, that such assessment could not be laid because the assessed valuation of the lots prior thereto being "nothing," it was impossible to comply with the law prohibiting an assessment exceeding one-half the value of the property assessed.

Where the valuation in an assessment roll is put merely in figures under the heading of "value of real estate," without anything to indicate whether they represented dollars or cents:

*Held*, that there is no valuation shown by such assessment roll.

*First Department, General Term, October,* 1880.

*Before* DAVIS, *P. J.,* BRADY *and* BARRETT, *JJ.*

Matter of Rector, &c., of the Church of the Holy Sepulchre.

APPEAL by the mayor, aldermen and commonalty from an order of the special term vacating an assessment.

The board of revision and correction of assessment lists confirmed, April 9th, 1874, an assessment for building underground drains extending from Seventy-third to Eighty-first streets, and from First to Fifth avenue, and a lien was thereby imposed on petitioners' lots situated on Seventy-fourth street. Petitioners allege that the assessment is invalid and void for substantial errors.

The testimony shows that the drain was constructed on the land of the petitioners, by the commissioner of public works, pursuant to authority conferred by the acts of the legislature, passed in 1865 and 1866.

That the drain was of no benefit to the church lots ; that no water or fluids flow from the church lands into the drain ; and that said lots are thoroughly drained by means of sewers constructed before the drain was built, and for which the church has paid an assessment.

That no consent was given for the building of said drains on their land by the petitioners, and no compensation had been made, offered or awarded to them therefor. To some part of this proof objection was taken by the corporation, and it was excluded (*See opinion*, LAWRENCE, *J.*). Petitioners also showed that there has been no prior valuation sufficient to sustain the assessment.

. The following is the opinion of the special term :

LAWRENCE, *J.* — The witnesses should not have been allowed to express an opinion as to whether the drains were necessary or useful, and the objections taken to such testimony by the corporation counsel are sustained. In other respects, the case seems to fall within the decision of *Cheesebrough* and the cases in the court of appeals which that decision was designed to follow. The assessment must therefore be vacated.

From the order entered vacating the assessment, this appeal is taken by the mayor, aldermen and commonalty.

*William C. Whitney*, for corporation.

I. The construction of the drains was necessary for the preservation of the public health. This is shown in the manner provided by the statute of 1871 by the certificate of the sanitary inspector and the resolution of the board of health, and there is no evidence whatever to the contrary.

II. The lands of the petitioners were among those that required to be drained in this manner. The certificate of the sanitary inspector and the resolution of the board of health were *prima facie* proof that all of the lands included within the boundaries named were derelict, as containing surface water, stagnant and deleterious to the health of the vicinity, and it was necessary for the petitioners to overcome the *prima facie* case thus made out. The extracts from the assessment map and the map showing the old water courses, annexed to this brief, show that the petitioners' lands did require draining and were drained in this manner. The presumption created by the action of the board of health was not overcome, and upon the case the petitioners' lands were in a condition requiring drainage for the preservation of the public health.

III. The petitioners' lands being derelict, as matter of law, the city was under no obligation to acquire from them the right to perform that work. In considering the proposition fully, it is necessary to discriminate this from other cases similar only in that they have been cases of drainage which may be pressed upon the court as bearing upon this case. As to the question whether the state has power to authorize a municipality to perform any official act, it is necessary to take the standpoint of the state in conferring the authority, in order to determine whether or not the act is legal. It is well-settled law that the state has the right to cause lands to be drained by the public authorities, and assessments to be imposed therefor upon the land benefited, and that the benefit to the public health is a sufficient public purpose justifying the interference of the state in the performance of the work and the imposition of

assessments. Of course, in general, the performance of such a work as the drainage of lands necessarily involves the entrance upon and the use of some land not itself requiring to be drained, and it, of course, necessarily follows that the state has no right to enter upon such land, or construct a public work upon it, of any character, without first taking proceedings to acquire the right, and making compensation for the burden thus imposed upon the property by putting it to a public use. That was the point held by the court of appeals in the *Matter of Cheesebrough*, decided in September last.

It was one in which the land before the court did not require draining, was not itself at fault, but was made to bear the burden of assisting to drain its neighbor's land which was at fault. The court says, EARL, J.: "He testified (and his evidence was not disputed) that his land was dry; that it had natural drainage; was in no way benefited by the drains." "It was a work not so much necessary for the lands of the petitioner as for other lands, and requiring drainage through his. It is believed that no case can be found justifying the permanent appropriation of land without compensation under such circumstances," citing *People* agt. *Nearing* (27 *N. Y.*, 306); *People* agt. *Haines* (49 *N. Y.*, 587); *Matter of Rhinelander* (68 *N. Y.*, 165); *Matter of Ryers* (72 *N. Y.*, 1). "The statute of 1861, therefore, did not and no statute could confer authority to construct this drain through the land of the petitioner without his consent, and without compensation to him for the land taken. The construction thereof was therefore a trespass, a wrongful act upon his land," &c. It is not claimed in behalf of the city in this case, that the state has any power to enter upon, construct any public work upon, or lay any burden upon any land not itself guilty of wrong, unless compensation is made for the public use. Wherever the public require the use of any land to carry out a necessary public improvement, it must be regularly acquired, and compensation made. But it has never yet been held that the city is powerless to abate a nuisance within its borders; that is, can-

not interfere and remedy a condition of things dangerous to the health of its people, and charge the expense thereof to the owner of the derelict property, without first proceeding by the tedious method established by the law for acquiring the property, or an easement in it, in order to enable the work to be done.

It is admitted that where it is desired to assess property not itself derelict (by reason of benefits it is supposed to receive from the improvements of the neighborhood) or where it is necessary to enter upon land not itself requiring drainage, for the purpose of constructing any portion of the public work, that in both of those cases the source of the power, and the mode of its execution, must necessarily follow the courses well known to the law as those pursued in the performance of an ordinary public work or public improvement; but the necessity arises from the fact that you propose to lay a burden upon land not itself derelict, to assess owners whose land did not require drainage. But where the state simply proposes to enter upon land guilty of the perpetration of a wrong to the community, the creation and maintenance of a nuisance, for the purpose of relieving the community by removing the nuisance and making the property conform to the conditions necessary for the public health or safety, charging the expense to the property derelict, there is no case to be found denying the power, and the long-established usage of the city, in the exercise of the power; and the many cases in which it has been sustained all support the proposition that it is a legitimate exercise of the police power possessed by the state. This case presents the question squarely, of property itself derelict, and there being no point made that any portion of the drain has been laid upon property not derelict (and therefore where it would be a trespass for the state to enter and carry on work), has not the state a right to authorize local officials, for the sake of the public health, to enter and make the necessary improvements required, and charge the expense of the same to the owners? The case of *Rhinelander* and other similar

cases, holding that the state was a trespasser, and that no assessment could be laid for a sewer thus constructed where the state had no right to construct it, and where the property owed no duty to the public to allow it to be constructed, were, without doubt, rightly decided; but the absurdity of applying the proposition to the case of an entrance by the state upon property guilty of a wrong to a community by maintaining a nuisance, is at once readily discerned. For what is the compensation to be made? Is the owner to be compensated for allowing the state to enter upon his land and removing a nuisance which he has been guilty of maintaining? The state is entering for the purpose of compelling him to perform a duty which he owed to the public, not for the purpose of conducting a public improvement for the benefit of the locality. The state is in the exercise of its police power in so doing (*See Cooley on Taxation*, 402; *Bliss* agt. *Krans*, 16 *Ohio State*, 55; *Sessions* agt. *Crunkilton*, 20 *Ohio State*, 319; *O'Reilly* agt. *The Draining Company*, 32 *Ind.*, 169; *Commonwealth* agt. *Alger*, 7 *Cushing Rep.*, 84).

*Elliott Sanford*, for petitioners.

I. Proof was offered on the part of the corporation, consisting of an extract from the records on file in the department of taxes, and an extract from the minutes of the board of health. To both of these documents petitioner took exception. To the first as incompetent and inadmissible, and not showing any money valuation; that no oath was shown to have been taken; and to the second, for similar and other reasons.

II. This evidence should have been excluded. The resolution of the board of health was not, so far as the case shows, ever communicated to the commissioner of public works. It is not pretended that the drain was built under the authority of the resolution. It was possibly the intention of the board to send the resolution and certificate to the commissioner of works, but there is no proof of the fact; and the assessment list states on its face that it was built by the commissioner of

public works under the other statutes. The resolution of the board of health on *ex parte* testimony, that a drain was necessary, is not competent to establish the fact alleged that petitioners' lots were a nuisance or "derelict," or required to be drained (*Clark* agt. *The Mayor*, 13 *Barb.*, 32; *Rogers* agt. *Barker*, 31 *Barb.*, 447). All proceedings affecting the property of individuals must be on notice (*Stuart* agt. *Palmer*, 74 *N. Y.*, 183; *Underwood* agt. *Green*, 42 *N. Y.*, 140; *Yates* agt. *Milwaukee*, 10 *Wall.*, 505). A certificate of the secretary, Storer, is not proof of any fact (*Parr,* agt. *Greenbush*, 72 *N. Y.*, 463; *Erickson* agt. *Smith*, 38 *How.*, 454; *Kobbe* agt. *Price*, 14 *Hun*, 55). It did not show when the valuation was made, and the necessary oath of the assessors was not shown, although required. An assessment roll without an oath is fatally defective (*Bellinger* agt. *Gray*, 51 *N. Y.*, 610; *Merritt* agt. *Portchester*, 71 *N. Y.*, 309).

III. Conceding for the moment that the evidence given in the certificate of Storer is competent, we contend that the "1,000" under the heading of value of real estate is no valuation. The court cannot say that these are dollars or cents. In *Brayley* agt. *Seaman* (30 *Cal.*, 610, 619), the court said, relative to the valuation of lots on a tax roll: "From such assessment roll it appeared that the lot in question was listed and in the column headed with the words 'value of real estate' were certain Arabic numerals with nothing in connection therewith to designate that they represented the quantity or the sum of anything whatever." In *People* agt. *Savings Union* (31 *Cal.*, 132), the court held: "In the assessment roll, in the column headed valuation, there is nothing whatever to indicate what the figures are intended to represent, and under the authorities cited we are not authorized to say that they mean dollars; they are simply numerals, barren figures; * * * or if money be indicated, the denominations may be either eagles, dollars, cents or mills. * * * Neither in the original or duplicate is there anything to indicate what the figures in the column headed valuation was intended to signify,

and the auditor was no more authorized to call them dollars than the court would be. \* \* \* Clearly then, under the authorities cited, there is no valuation shown by the original assessment or duplicate." In *Lawrence* agt. *Fast* (20 *Ill.*, 338), CANON, C. J., says : "I do not think we have sunk to so low a degree of uncertainty, nor have we attained such a perfection of intuitive knowledge as to justify us in saying what these figures mean. The figures without denominations are senseless, as would be denominations without figures" (*See, also, Lane* agt. *Bommelman*, 21 *Ill.* 143 ; *Potwin* agt. *Oudes*, 45 *id.*, 366 ; *Pittsburg R. Co.* agt. *Chicago*, 53 *id.*, 80 ; *Woods* agt. *Freeman*, 1 *Wall.*, 398 ; *People* agt. *Hastings*, 34 *Cal.*, 571 ; *Randolph* agt. *Metcalf*, 4 *Cald.* [*Tenn.*], 407 ; *Hurlbut* agt. *Butenop*, 27 *Cal.*, 50, 57). Until the corporation can show the value placed on petitioners' lots by a money valuation under oath in a book or roll of annual valuations made by the deputy tax commissioner (*sec.* 8, *chap.* 302, *Laws* 1859), the assessment cannot be sustained (66 *N. Y.*, 395).

IV. The court below was correct in disregarding these two documents as incompetent proof. The map attached to appellant's brief was not in evidence below. It formed no part of the case and should be disregarded on appeal. On that map other lots are the property of Charles Jenkins, and petitioners' lots are designated by the correct name. The map is not complete, as but one block is given, while, in fact, as already shown, the drain extends through seven blocks and four avenues.

V. There is no proof that the drain was constructed under the act of 1871. The extract from the records of the board of health is dated May 10, 1871, and the case shows that the drain was constructed by the commissioners of works more than two years after that date. The "urgent need" described by the sanitary inspector, on which the police power depends, did not exist in this case, and although the health board may have resolved to request the work to be done under the law

of 1871, the commissioner chose to do the work apparently under other authority.

VI. The testimony of two of the officers of the church as to whether the drain was useful, was excluded by the court below, and the claim that the order should be reversed for the erroneous ruling of the court in admitting it, is clearly unfounded. These witnesses were competent to testify as to the fact that the church lots were dry and well sewered, and the inference that the drains were useless may well be omitted.

VII. There is no such thing as " derelict " land in this city. Petitioners' land was not " derelict." Three of his lots, as shown on the map attached to appellant's points, are not touched by the drain, while the fourth is, and the same map shows an ordinary sewer constructed in Seventy-fourth street, along petitioners' front, and also a sewer in Seventy-fifth street. If there was need of an underground drain, it could have been constructed along the line of the two streets near the lots, and would have drained as much area as if built in the middle of the block. The sanitary inspector did not certify that all the lands were below the sewer level. He expressly excludes part of them, and petitioners show that their land was not included. There is no power under the act of 1871 to drain any lands not below the sewer level. Petitioners were not guilty of any wrong. The natural water-course was stopped by the building of sewers, streets and avenues by the corporation. This same water-course was obstructed by the city, and they had to pay the damages (*Donohoe* agt. *The Mayor*, 3 *Daly*, 65, BRADY J).

VIII. The court of appeals held (*In re Cheesebrough*) that the statute of 1871 did not, "and no statute could confer authority to construct this drain through the land of the petitioner without his consent, and without compensation to him for the land taken. The construction thereof was, therefore, a trespass, a wrongful act on his land." In this case, also, the drain was built on the land of the petitioner, and there is no material difference whether the drain begins at a point outside

of and crosses through the land of an individual, or starts at a point in one corner of his land and runs along through it (*Philip* agt. *Thompson*, 1 *Johns. Ch.*, 131).

IX. The land of petitioners was taken for a public use, without their knowledge. They had no notice of the pro-ceeding. They were entitled to notice (*Owener* agt. *Albany*, 15 *Wend.*, 374; *Dyckman* agt. *The Mayor*, 5 *N. Y.*, 434; *Dickey* agt. *Tennison*, 27 *Mo.*, 373; *Purdy* agt. *Martin*, 31 *Mich.*, 455; *Stuart* agt. *Palmer*, 74 *N. Y.*, 183; *Cooley Const. Lim.*, 562, 563). Neither a person nor the state can intrude on a person's land save in a lawful manner (5 *Hun*, 591; 58 *N. Y.*, 416). No compensation having in this case been made, offered or awarded, the drain was unlawfully built. The right to enter does not exist till after payment in full has been made. An entry without payment is a trespass (*Mill on Eminent Domain*, secs. 130, 135, *et seq*). The coun-sel for the appellants argues that while it is unlawful to enter on dry land and build a drain, it is not unlawful to enter on moist or wet land and there build a blind drain. That was not the view of the framers of the constitution when it was pro-vided (*sec.* 6) that private property (wet or dry) should not be taken for public use without just compensation by due pro-cess of law. No qualification is made whether the owner be deprived by the police power or by eminent domain.

X. The learned brief submitted by the counsel for the appellants herein, relative to the police power is, *ipsisimis verbis*, identical with that presented to the court of appeals *In re Van Buren*. It is impossible that the court of appeals when sustaining the objections taken to that assessment over-looked these pages. In that case the general term vacated the assessment. As a reason why this general term should be reversed this lengthy point was argued on the appeal, as appears from the appellant's points herein. The court of appeals affirmed the order below, and we may justly conclude that if it was tenable the general term would not have been affirmed.

XI. We contend that the construction of the drain on private land was a trespass and a wrongful act falling within the decisions (*In re Cheesebrough*; *In re Rhinelander*, 68 *N. Y.*, 105; *People* agt. *Haines*, 49 *N. Y.* 587). The appellants are not able to distinguish this from the *Cheesebrough case*. The court below was correct, and the order should be affirmed.

BARRETT, *J.*— This was an application to vacate an assessment imposed upon the petitioners' lots for an underground drain. The drain ran through these lots and was, in part, constructed thereon. The petitioners' lands having been thus appropriated, without its consent and without compensation, the case is brought directly within the principle of *In re Cheesebrough* (78 *N. Y.*, 232), where it was held that land, itself dry and free from nuisance, could not be permanently appropriated for drains for the benefit of other lands, nor even for the general welfare, without compensation.

The learned counsel to the corporation seeks, however, to distinguish this from the *Cheesebrough case* and to apply thereto the police power doctrine. The distinction claimed is that in the present instance the lots were used not merely for the benefit of other lands, but for their own benefit; that such lots lay below the level of the adjacent sewers and were covered with stagnant water; and that consequently the underground drainage of the petitioners' lots was absolutely essential to the public health and welfare. The difficulty is that the facts do not justify the distinction nor bring up the question so elaborately and ably discussed in the brief submitted for our consideration. For example, there is no evidence that the petitioners' lots were derelict.

They are not necessarily included in the certificate of the sanitary inspector, condemning certain lands as dangerous to the public health. This certificate speaks of lands or parts of them within certain boundaries. But the parts are not indicated. An accompanying map is referred to, but it is not

upon the record. There is, therefore, nothing wherewith to identify the petitioners' lots nor to charge them as nuisances. Upon the other hand, the testimony adduced by the petitioner shows that the lots were not in any way benefited by the drain and that, in fact, these lots had already been drained, and that thoroughly, by means of ordinary sewers (constructed before the underground drain was contemplated) for which an assessment had been duly paid. There was, therefore, no evidence to justify a finding that the condition of the petitioners' lots was such as to jeopardize the health of the neighborhood. Nor could there have been any great emergency nor immediate necessity, since we find that the drain was not constructed for some two years after the certificate of the sanitary inspector was presented to the board of health.

And, further, the work does not seem to have been done under the act of 1871 (*chap.* 566) at all, nor in consequence of either this certificate or the resolution of the board which followed. The assessment list shows that the drain was constructed by the commissioner of public works, pursuant to authority conferred by the acts of 1865 and 1866, while there is "no evidence that the resolution of the board of health (passed under the authority of the act of 1871), requesting the department of public works to drain the land, was ever delivered to or acted upon by that department."

There is another and equally fatal objection to this assessment. It does not appear that, prior thereto, any valuation was ever placed upon the lots in question by the tax assessing officers. *Per contra*, it does appear that from the years 1869 to 1874 inclusive, their assessed valuation was "nothing." It was impossible, therefore, to comply with the provision in the act of 1840 (*chap.* 326, *sec.* 7), prohibiting an assessment exceeding one-half the value of the property, as thus valued, and the case upon that head is thus within the matter of *Second Avenue Methodist Episcopal Church* (66 *N. Y.*, 395).

We have not overlooked the attempt to show such valuation by the certificate of the secretary of the department of taxes

and assessments. But this certificate, if proof at all, does not show when the valuation was made. *Non constat*, it was subsequent to the assessment for the blind drain. Nor was the assessment list verified by the oath of the assessors. Nor was the valuation put in dollars and cents, but in figures without denomination. Upon both points we think the assessment was properly vacated. The order appealed from should, therefore, be affirmed with costs.

BRADY, J., concurs.

DAVIS, *P. J.*, *dissenting.*— I think the order in this case should be reversed and the matter sent back to the special term for a rehearing, on which rehearing the facts can be more fully and fairly presented. There is danger of doing great injustice to the city without a fuller presentation is made of the facts which ought to determine the questions involved herein.